# UNITED STATES DISTRICT COURT
for the
Eastern District of California

FILED
JUL 22 2014
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY DEPUTY CLERK

United States of America
v.
AJELLON DEDEAUX,
CORAL WILSON,
GLENN BARROWS,
JERMAINE NEWMAN,
FRANK LOBATOS,
RICHARD O'CONNELL,
KRISLEN BRIDGES, and
MEUY LAI SAECHAO
*Defendant(s)*

Case No. 2:14-MJ-0149 KJN

SEALED

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of (1) February 10, 2014 to July 8, 2014; and (2) in or about March 2014 in the county of Sacramento in the Eastern District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| (1) 21 U.S.C. §§ 846 and 841(a)(1) | Conspiracy to Distribute and Possession with Intent to Distribute Oxycodone (ALL DEFENDANTS EXCEPT FOR GLENN BARROWS); |
| (2) 21 U.S.C. §§ 846 and 841(a)(1) | Conspiracy to Distribute and Possession with Intent to Distribute Cocaine (DEDEAUX and BARROWS ONLY) |

This criminal complaint is based on these facts:

(see attached AFFIDAVIT)

☒ Continued on the attached sheet.

*Complainant's signature*

DEA Investigator Craig Tom II
*Printed name and title*

Sworn to before me and signed in my presence.

Date: July 21, 2014

*Judge's signature*

City and state: Sacramento, CA

Kendall J. Newman, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF COMPLAINT AND SEARCH WARRANTS

I, Craig Tom II, United States Department of Justice, Drug Enforcement Administration, do swear and affirm as follows:

## INTRODUCTION

1. This Affidavit is in support of a complaint charging:

   i. Ajellon DEDAUX, Coral WILSON, Jermaine NEWMAN, Frank LOBATOS, Richard O'CONNELL, Krislen BRIDGES, and Meuy Lai SAECHAO with conspiracy to distribute and possess with intent to distribute oxycodone in violation of Title 21 U.S.C. §§ 846 and 841(a)(1); and

   ii. Ajellon DEDAUX and Glenn BARROWS with conspiracy to distribute cocaine in violation of Title 21 U.S.C. §§ 846 and 841(a)(1);

2. This Affidavit is also submitted in support of an application for warrants to search the following premises:

   i. 8965 Rosetta Circle, Sacramento, California (residence of Coral WILSON and Glenn BARROWS); and

   ii. 3250 Laurelhurst Drive, Apartment 168, Rancho Cordova, CA (residence of Ajellon DEDEAUX) (Both residences collectively referenced to as "Subject Premises").

3. The Subject Premises are described in more detail and depicted in Attachment A, which are attached hereto and incorporated by reference herein. The items to be searched for and seized are more specifically described in Attachment B.

4. Information that I have collected in the course of this investigation establishes probable cause to believe that evidence of violations of 21 U.S.C. §§ 846, 841(a)(1) described above will be found at the Subject Premises. Based on my training and experience, and the facts described herein, I believe there is probable cause to believe that evidence of distribution and possession

with intent to distribute controlled substances, including but not exclusive to oxycodone, will be found at the Subject Premises.

5. The facts and information set forth in this Affidavit are based upon my personal observations, observations of other law enforcement officers, and my review of official police reports, and other investigative reports or documentation accumulated during this investigation. Because this Affidavit is submitted for the purpose of setting forth probable cause for the complaint, arrest warrants, and the requested search warrants, I have not included each and every fact known to me concerning this investigation. I have included what I believe to be adequate facts to establish probable cause that the subjects involved have committed violations of 21 U.S.C. §§ 841(a)(1) and 846 and that evidence related to those violations may be found at the Subject Premises.

## AGENT BACKGROUND

6. The undersigned Affiant, Craig Tom, (Affiant) is a duly appointed Diversion Investigator of the Drug Enforcement Administration (DEA), United States Department of Justice, assigned to the Sacramento, California District Office.

7. In October 2010, I was hired by the DEA. I completed a 13-week, Basic Diversion Investigator Training where I received training in the manufacturing, distribution and dispensation of pharmaceutical controlled substances, and the corresponding records and inventories that are required to be kept pursuant to the Comprehensive Drug Abuse Prevention and Control Act of 1970 (Public Law 91-513).

8. In March 2011, I was assigned to the DEA Sacramento District Office (SDO) Diversion Group where I participated in Search Warrants, Administrative Inspection Warrants, and Administrative Hearings.

9. I attended the 2011 California Narcotic Officers Association (CNOA) training seminar whereby I received over 20 hours of narcotic training on current drug trafficking trends.

10. In December 2012, I was assigned to the DEA SDO Tactical Diversion Squad (TDS), which has the mission to identify, recognize, investigate and report the diversion of controlled

substances and list chemical from legitimate sources, as well as illegitimate sources, while at the same time ensuring an adequate and uninterrupted supply of controlled substances and list chemicals for legitimate medical, scientific and other approved needs. While in the TDS, I authored federal search warrants, arrest warrants, and testified before the Grand Jury. I have also become familiar with the manner in which drug traffickers use telephones, often cellular telephones, to conduct their illegal operations. In addition, the Affiant has spoken to and worked with experienced federal, state, and local narcotics officers and diversion investigators.

## FACTS ESTABLISHING PROBABLE CAUSE

11. The United States government, including the DEA, is investigating the distribution of oxycodone, heroin, and marijuana by a group sourced from the greater Sacramento, California area. The investigation concerns possible violations by known and unknown individuals of, inter alia, Title 21 of the United States Code, Section 841(a)(1).

12. The DEA Boise Resident Office (BRO) began investigating what was then known as the "Austin SERB" Drug Trafficking Organization (DTO) in November 2013. The SERB DTO was identified by DEA BRO as a multi-thousand pill oxycodone distributor in the Boise, Idaho area. The SERB DTO also distributes heroin and marijuana with the source of supply in California.

13. In January 2014, the DEA Sacramento District Office (SDO) Tactical Diversion Squad (TDS) identified Ajellon DEDEAUX as the source of supply for oxycodone for the SERB DTO in Boise, ID.

14. On February 10, 2014, at approximately 8:30 a.m., surveillance was established at 3250 Laurelhurst Drive, Apartment 168, Rancho Cordova, CA. This location was the suspected residence of Ajellon DEDEAUX. At this time, GPS data on DEDEAUX's phone reflected the phone was located off of Laurelhurst Drive. SA Daniel Moriarty saw Ajellon DEDEAUX walk away from Apartment 168, enter a Ford Focus, and leave the apartment complex. At approximately 12:05 p.m., SA Moriarty saw DEDEAUX return to his apartment and park in parking space 109. At approximately 1:25 p.m., SA Kittrell observed DEDEAUX and Andrew COLWELL walk away from Apartment 168, enter the Ford Focus, and drive away from the apartment complex. At approximately 2:30 p.m., SA Babak Ghazanfari saw DEDEAUX and

COLWELL arrive at the United States Post Office (2000 Royal Oaks Dr, Sacramento, CA; Royal Oaks Station). Soon after, SA Moriarty saw DEDEAUX walking out of the post office with some paperwork and return to COLWELL's car. It appeared as though he provided paperwork to COLWELL who was still seated in the driver's seat. At this time, GPS data on DEDEAUX's phone reflected the phone was located off of Royal Oaks Drive.

15. At approximately 2:42 p.m., COLWELL walked into the post office alone and mailed a package to Boise, ID. COLWELL chose to have the package delivered to Boise the next day and details on the package are as follows:

- Sender: Derek THOMPSON, 3042 Mills Park Drive #87, Rancho Cordova, CA 95670 Phone: (916) 380-9083.
- Recipient: Jake HICKS, 6000 Clinton St, Boise, ID 83704
- Package Weight: 9 ounces Time Accepted: 2:41 PM

16. The package was not seized and was delivered to the above address. This was the first occasion where agents saw DEDEAUX and COLWELL mail a package using USPS.

<u>200 Oxycodone 30mg Pill Seizure</u>

17. On February 25, 2014, at approximately 11:45 a.m., SA Moriarty saw COLWELL and DEDEAUX meet with Coral WILSON driving a 2005 white Chrysler 300 bearing CA license #6FBU512 (R/O Coral L WILSON, 8969 Rosetta Circle, Sacramento, CA, 95826). FBI SA Neeki Bianchi saw DEDEAUX exit his vehicle and enter the 2005 white Chrysler 300. A short time later, DEDEAUX exited the vehicle and entered his vehicle. DEDEAUX and COLWELL left the gas station and SA Ghazanfari saw DEDEAUX and COLWELL driving Eastbound US Highway 50.

18. At approximately 12:23 pm, SA Ghazanfari saw COLWELL and DEDEAUX arrive at the US Post Office located at 10923 Progress Ct, Rancho Cordova, CA 95670.

19. At approximately 12:32 pm, SA Ghazanfari saw DEDEAUX exit the vehicle, enter the building, and return with a USPS packaging envelope.

20. At approximately 12:35 pm, SA Ghazanfari saw COLWELL exit the vehicle and enter the building with a USPS packaging envelope. SA Moriarty was inside the Post Office with SA LeMaire and relayed to SA Ghazanfari that the Post Office clerk could not guarantee overnight delivery to Idaho. COLWELL then left the Post Office.

21. At approximately 12:40 pm, SA Ghazanfari saw COLWELL exit the Post Office and drive away with DEDEAUX in the passenger seat of his vehicle (Ford Focus) followed by surveillance.

22. At approximately 12:52 pm, SA Ghazanfari saw COLWELL and DEDEAUX arrive at the US Post Office located at 7862 Winding Way, Fair Oaks, CA 95628. COLWELL exited the vehicle and entered the building. SA Moriarty and SA LeMaire were inside the Post Office and saw COLWELL mail and pay postage for a package addressed from: Dan Jones, 3042 Mills Park Drive, #132, Rancho Cordova, CA 95670, to: 2973 S Colorado Ave, Boise, ID, 83706.

23. On February 26, 2014, a federal search warrant was signed by U.S. District Court Judge Edward J. Lodge. The search warrant authorized the opening of a package which was supposed to be delivered to Todd JENSEN at 2973 South Colorado Avenue, Boise, Idaho. Based on telephone calls intercepted and surveillance of COLWELL and DEDEAUX, the package was believed to hold oxycodone to be shipped to SNYDER and SERB. USPS Inspector Marcel Korvela brought the package to the DEA Boise R.O. Once there the package was opened by SA Niles Gooding. The package consisted of a US Postal Service envelope which further contained a US Postal Service box. Inside the box, a stuffed bear was located along with a box of crayons and a "Friends Together" diary. The stuffed bear was cut open and inside the bear were 200 oxycodone 30mg pills.

<u>480 Oxycodone 30mg Pill Seizure</u>

24. On March 6, 2014, at approximately 2:45 pm, GPS tracker data on COLWELLS's Ford Focus was in the vicinity of 12th Street and J Street in Sacramento, CA. SA Robert E. Kittrell and SA Ghazanfari were directed to the vicinity of that location in order to observe the activities of Andrew COLWELL.

25. At approximately 2:48 pm, SA Kittrell saw the previously identified Ford Focus, Idaho license 1A1J126 (R/O: Douglas Colwell, 2266 Scyene Way, Boise, ID 83712) parked on the corner of 12th Street and J Street, Sacramento, CA. The vehicle appeared to be unoccupied. NOTE: The vehicle was parked across the street from a Fed Ex store located at 1200 J Street, Sacramento, CA.

26. At approximately 2:52 pm SA Ghazanfari and SA Kittrell saw COLWELL leaving the store. SA Kittrell then saw COLWELL enter the Ford Focus. At that time, SA Kittrell saw that there was an unknown individual sitting low in the passenger seat of the Focus. SA Kittrell watched as the Ford Focus drove from the area.

27. At approximately 3:02 pm, SA Ghazanfari and DI Tom requested to see packages going to Idaho. DI Tom and SA Ghazanfari took digital photographs of a FedEx Envelope outgoing to "Ben Miller, West Producer DR, Meridian, Idaho 83646" from "Todd Davis, 2900 Weald Way, Apt #117, Sacramento, California 95833."

28. On March 7, 2014, a federal search warrant was executed on the package purportedly sent by Todd Davis to Ben Miller at 239 West Producer, Meridian, ID. The package was taken from the FedEx facility located at 2622 Lockheed Lane, Boise, ID 83705. The package was seized by SA Niles Gooding as witnessed by SA Dustin Bloxham. The package was opened and found to contain a teddy bear filled with 480 oxycodone pills. The bear was found inside a USPS box which was located inside a FedEx envelope.

Cocaine Powder Seizure and Arrest of COLWELL, SERB, and SNYDER

29. On March 7, 2014, at approximately 9:00 am, the GPS Tracker data on COLWELL's Ford Focus was in Meridian, ID. A traffic stop was performed by the Ada County Sheriff's Office. COLWELL admitted that he had a large quantity of cocaine and hash oil hidden inside the vehicle. COLWELL advised that he had four ounces of cocaine and six ounces of hash oil vacuumed sealed inside the rear passenger door panel. A search of the vehicle revealed 149.2 grams of suspected cocaine powder, 64.9 grams of suspected hashish, and miscellaneous pharmaceutical pills. The drugs were seized by Boise Police Department (BPD) and transported to the BPD Narcotics Unit where the exhibits were stored in their drug evidence vault for

safekeeping. COLWELL was arrested and charged with delivery of a Schedule I controlled substance and drug trafficking of cocaine.

30. On March 7, 2014, at approximately 12:05 p.m., SERB was arrested in the Hastings parking lot located at 5 Mile and Overland in Boise, ID. SERB was arrested based on probable cause for distribution of oxycodone. SERB was later indicted by a federal grand jury pursuant to a Title III investigation. SERB was indicted for conspiracy to distribute oxycodone.

31. On March 7, 2014, at approximately 2:45 p.m., SNYDER was arrested at his residence, 2973 S. Colorado Ave, Boise, ID. A search warrant was also served at the residence and agents found numerous pills, pill bottles, FedEx packages, and a large amount of US currency hidden inside his closet.

Post Arrest Interviews of COLWELL, SERB, and SNYDER

32. In March 2014, the DEA BRO arrested Austin SERB, Andrew COLWELL, Christopher SNYDER, and other SERB DTO associates. SERB, COLWELL, and SYNDER have been interviewed by law enforcement.

33. On March 25, 2014, SA Moriarty and IRS McCain interviewed COLWELL in regards to the DEDEAUX DTO. COLWELL first met DEDEAUX in late December 2013 or early January 2014 at SERB's residence in Boise, ID. SERB introduced COLWELL to DEDEAUX. COLWELL further stated that DEDEAUX and Brittany MELVIN brought oxycodone 30mg pills to Boise, ID from Rancho Cordova, CA during the trip. The oxycodone pills were sold to SERB. COLWELL stated that he was uncertain of MELVIN's involvement in drug trafficking activities with DEDEAUX, but MELVIN gave advice to COLWELL about how to keep a low profile and not act like SERB.

34. COLWELL traveled to Rancho Cordova, CA to visit DEDEAUX in late January 2014 with the purpose to show how DEDEAUX how to make hash oil to sell. Initially COLWELL stayed at the Fairfield Inn in Rancho Cordova, CA but then stayed at DEDEAUX's residence at 3250 Laurelhurst Drive, #168, Rancho Cordova, CA. COLWELL stated that he made hash oil on two occasions on the balcony of DEDEAUX's residence.

35. COLWELL stated that DEDEAUX packaged the oxycodone 30mg pills inside a stuffed animal and mailed the majority of the pills via the United States Postal Service (USPS). DEDEAUX also used Federal Express to ship some of the pills. DEDEAUX kept packaging material, including labels and boxes, at DEDEAUX's apartment in Rancho Cordova, CA. DEDEAUX also used gloves when preparing the packages. DEDEAUX directed COLWELL to go into the post office locations to mail the packages on several occasions. COLWELL stated that all the packages sent by DEDEAUX to Boise, ID were intended for either SERB or SNYDER.

36. COLWELL stated that DEDEAUX's associates allowed the deposit of drug proceeds into personal bank accounts. COLWELL stated that bank account information was communicated via TXTcrypt, encrypted text messaging application, between DEDEAUX, SERB, SNYDER, and himself.

37. On March 25, 2014, SA Moriarty and IRS McCain interviewed SERB in regards to the DEDEAUX DTO. SERB stated that he met DEDEAUX, also known as "AJ" and "Jeezy," three times in Boise, ID. The first meeting was sometime in 2011. The second meeting was in May 2012, in which SERB provided DEDEAUX and NEWMAN with approximately $30,000.00 for the delivery of oxycodone. The third meeting was in early January 2014, in which DEDEAUX and Brittany MELVIN delivered oxycodone 30mg pills.

38. SERB stated that DEDEAUX would usually send oxycodone 30mg pills to SERB via USPS. A normal package would include up to 500 oxycodone 30mg pills concealed inside candles or stuffed animals. DEDEAUX would only ship to an address two or three times before requesting a new address to use, and DEDEAUX requested that SERB track the status of the packages for delivery information.

39. SERB stated that drug proceeds were deposited directly into accounts specified by DEDEAUX. The account name and bank information was communicated via TXTcrypt between SERB and DEDEAUX.

40. On March 25, 2014, SA Moriarty and IRS McCain interviewed SNYDER in regards to the DEDEAUX DTO. SNYDER stated that he met DEDEUAX in October 2013 in Boise, ID.

SERB introduced SNYDER to DEDEAUX. SNYDER stated that DEDEAUX sent shipments of oxycodone via USPS. SERB further stated that Andrew COLWELL traveled to Sacramento in January 2014 to meet with DEDEAUX and manufacture hash oil. Once COLWELL was in Sacramento, COLWELL arranged for shipments of oxycodone to SNYDER under DEDEAUX's direction. SNYDER stated DEDEAUX gave SNYDER $125 worth of oxycodone pills per shipment received. Once the shipment was received, SNYDER would remove the $125 worth of oxycodone pills and deliver the remaining pills to SERB. SNYDER stated that DEDEAUX directed him to deposit money into several accounts.

**Coral WILSON**

41. On February 25, 2014, at approximately 11:45 a.m., SA Moriarty saw COLWELL and DEDEAUX meet with WILSON driving a 2005 white Chrysler 300 bearing CA license #6FBU512 (R/O Coral L WILSON, 8969 Rosetta Circle, Sacramento, CA, 95826). FBI SA Neeki Bianchi saw DEDEAUX exit his vehicle and enter the 2005 white Chrysler 300. A short time later, DEDEAUX exited the vehicle and entered his vehicle. DEDEAUX and COLWELL left the gas station and SA Ghazanfari saw DEDEAUX and COLWELL driving Eastbound US Highway 50.

42. At approximately 12:52 pm, SA Ghazanfari saw COLWELL and AJ arrive at the US Post Office located at 7862 Winding Way, Fair Oaks, CA 95628. COLWELL exited the vehicle and entered the building. SA Moriarty and SA LeMaire were inside the Post Office and saw COLWELL mail and pay postage for a package addressed from: Dan Jones, 3042 Mills Park Drive, #132, Rancho Cordova, CA 95670, to: 2973 S Colorado Ave, Boise, ID, 83706.

43. On February 26, 2014, a federal search warrant was signed by U.S. District Court Judge Edward J. Lodge. The search warrant authorized the opening of a package which was supposed to be delivered to Todd JENSEN at 2973 South Colorado Avenue, Boise, Idaho. The package consisted of a US Postal Service envelope which further contained a US Postal Service box. Inside the box a stuffed bear was located along with a box of crayons and a "Friends Together" diary. The stuffed bear was cut open and inside the bear were 200 oxycodone 30mg pills.

44. On March 25, 2014, SA Moriarty and IRS McCain interviewed COLWELL in regards to the DEDEAUX DTO. While in California, COLWELL stated that WILSON, also known as "C.C.," supplied DEDEAUX with oxycodone 30mg pills. DEDEAUX would meet WILSON in parking lots, and DEDEAUX would get in WILSON's car or stand by the car and conduct the drug transaction. COLWELL stated that WILSON came to DEDEAUX's apartment on at least one occasion. COLWELL further stated that WILSON drove a white or silver Chrysler 300. COLWELL stated that a Hispanic male, identified as Glenn BARROWS would sometimes accompany WILSON during the drug transactions. COLWELL believed BARROWS to be WILSON's boyfriend. A commercial database query provided that WILSON previously resided at 8969 Rosetta Circle, Sacramento CA, but currently resides at 8965 Rosetta Circle, Sacramento CA. This residence is located next to 8969 Rosetta Circle. FBI surveillance observed WILSON depart the residence at 8965 Rosetta Circle on May 8, 2014.

45. Based on the surveillance and statements by COLWELL, I believe that WILSON supplied DEDEAUX and COLWELL with the 200 oxycodone 30mg pills that were seized on February 26, 2014 in Boise, ID.

**Glenn BARROWS**

46. On March 25, 2014, SA Moriarty and IRS McCain interviewed COLWELL in regards to the DEDEAUX DTO. COLWELL stated that DEDEAUX and COLWELL purchased a quarter pound of cocaine for $3,900 from BARROWS at 8965 Rosetta Circle, Sacramento, CA. A commercial database query for Coral WILSON indicated that WILSON resided at 8965 Rosetta Circle, Sacramento, CA. COLWELL drove DEDEAUX to BARROWS' residence and DEDEAUX went inside the house to purchase the cocaine from BARROWS and brought it back to the car where COLWELL remained. COLWELL did not witness the transaction.

47. On April 17, 2014, CHP Officer Rodgers conducted a traffic stop of Glenn BARROWS' white 2001 Mercedes C500 (CA License #5XCV406) at Howe Avenue and La Riviera Drive in Sacramento, California. As a result of the traffic stop, BARROWS (Driver) was arrested for CA H&S 11351 - possess cocaine for sales, CA H&S 11352(a) - transportation of cocaine for sales,

and CA PC 182 - conspiracy. During the traffic stop, the passenger of the vehicle claimed that the recovered cocaine was his and not Glenn BARROWS.

48. Based on statements by COLWELL and the traffic stop, I believe BARROWS to have supplied DEDEAUX with cocaine in March 2014.

**Jermaine NEWMAN**

49. NEWMAN was arrested in Oroville, CA on November 23, 2013, by officers from the Butte County Sheriff Office (BCSO) after a traffic stop of a vehicle driven by NEWMAN revealed approximately 73 pounds of processed marijuana in the vehicle. On July 10, 2014, NEWMAN pled no contest to CA H&S Code 11358 (unauthorized cultivation, harvesting, or processing of marijuana).

50. On March 25, 2014, SA Moriarty and IRS McCain interviewed COLWELL in regards to the DEDEAUX DTO. While in California, COLWELL met several of DEDEAUX's close associates, including NEWMAN. COLWELL stated that DEDEAUX and NEWMAN met approximately once a week, and that COLWELL was present when NEWMAN and an unidentified white female sold an unspecified quantity of oxycodone 30mg pills to DEDEAUX in Sacramento, CA.

51. On March 25, 2014, SA Moriarty and IRS McCain interviewed SERB in regards to the DEDEAUX DTO. During May 2012, SERB stated that he met with DEDEAUX and NEWMAN in Boise, ID. SERB further stated that he provided DEDEAUX and NEWMAN with approximately $30,000.00 for the delivery of oxycodone. In May 23, 2012, Nevada Highway Patrol (NHP) conducted a traffic stop of NEWMAN (Driver), DEDEAUX, and Max FISCHER westbound I-80 outside of Sparks, Nevada. NHP seized $23,831 during the traffic stop.

52. 916-604-1372, used by Jermaine NEWMAN, was in contact with 916-698-3806, 208-695-0194, 208-608-9560, and 916-662-1513 approximately 612 times from November 25, 2013 to April 9, 2014. The four telephones were used by DEDEAUX.

53. 916-254-6795, used by Jermaine NEWMAN, was in contact with 209-620-3144, used by DEDEAUX, approximately 344 times from May 2, 2014 to July 8, 2014.

54. Based on the statements by COLWELL and SERB, the NHP traffic stop and seizure, and phone toll analysis between DEDEAUX and NEWMAN, I believe that NEWMAN conspired with DEDEAUX to distribute narcotic controlled substances.

**Frank LOBATOS**

55. On March 7, 2014, BPD arrested COLWELL en route from Rancho Cordova, CA to Boise, ID transporting cocaine, hash oil, and miscellaneous pharmaceuticals. COLWELL signed a BPD Voluntary Consent to Search form for the four phones in his possession. COLWELL explained to BPD and DEA that DEDEAUX, SERB, SNYDER, and COLWELL used an encrypted text messaging app called TXTcrypt to communicate the financial transactions for drugs sourced by DEDEAUX. BPD took pictures of the TXTcrypt messages on COLWELL's phone that contained names and bank account information. LOBATOS' name and bank account was provided on at least four occasions as presented on Attachment 1.

56. On March 25, 2014, SA Moriarty and IRS McCain interviewed COLWELL in regards to the DEDEAUX DTO. While in California, COLWELL met several of DEDEAUX's close associates, including LOBATOS. COLWELL stated that LOBATOS acquires oxycodone 30mg pills for DEDEAUX and allows drug proceeds to be deposited into LOBATOS' account. LOBATOS is paid $100 by DEDEAUX each time a deposit is made into LOBATOS' account. COLWELL stated that DEDEAUX directed SERB and SNYDER to make deposits into LOBATOS' account from Boise, ID. COLWELL further stated that LOBATOS would then withdraw the cash, and give the money to DEDEAUX.

57. On March 25, 2014, SA Moriarty and IRS McCain interviewed SNYDER in regards to the DEDEAUX DTO. SNYDER stated that he deposited money into bank accounts controlled by DEDEAUX. SNYDER further stated that DEDEUAX provided him bank account names and numbers to deposit drug related proceeds. SNYDER recalled LOBATOS as the holder of one of the accounts that he deposited money into as directed by DEDEAUX.

58. On March 25, 2014, SA Moriarty and IRS McCain interviewed SERB in regards to the DEDEAUX DTO. SERB stated that drug proceeds were deposited into accounts specified by DEDEAUX. The account name and bank information was communicated via an encrypted text

message between SERB and DEDEAUX. SERB stated that DEDEAUX provided LOBATOS's name and bank account information to deposit money into.

59. 916-589-0297, subscribed to Frank LOBATOS, 10378 Birmingham Way, Rancho Cordova, CA 95670, was in contact with 916-698-3806, 208-608-9560, 916-662-1513, and 209-620-3144 approximately 797 times from November 12, 2013 to June 15, 2014. The four telephones are, or were, used by DEDEAUX.

60. 916-417-1074, subscribed to Frank LOBATOS, 10378 Birmingham Way, Rancho Cordova, CA 95670, was in contact with 209-620-3144 approximately 287 times from May 24, 2014 to July 8, 2014. 209-620-314 is used by DEDEAUX.

61. Based on LOBATOS' name and bank account information on COLWELL's phone, the statements by COLWELL, SERB, and SNYDER, and phone toll analysis between DEDEAUX and LOBATOS, I believe that LOBATOS conspired with DEDEAUX to allow the use of his bank account to conceal drug proceeds in addition to conspiring to obtaining oxycodone pills.

**Richard O'CONNELL**

62. On March 7, 2014, BPD arrested COLWELL en route from Rancho Cordova, CA to Boise, ID transporting cocaine, hash oil, and miscellaneous pharmaceuticals. COLWELL signed a BPD Voluntary Consent to Search form for the four phones in his possession. COLWELL explained to BPD and DEA that DEDEAUX, SERB, SNYDER, and COLWELL used an encrypted text messaging app called TXTcrypt to communicate the financial transactions for drugs sourced by DEDEAUX. BPD took pictures of the TXTcrypt messages on COLWELL's phone that contained names and bank account information. O'CONNELL's name and bank account was provided on at least two occasions as presented on Attachment 1.

63. On March 25, 2014, SA Moriarty and IRS McCain interviewed COLWELL in regards to the DEDEAUX DTO. COLWELL stated that DEDEAUX's associates allowed the deposit of drug proceeds into personal bank accounts. COLWELL further identified O'CONNELL as one of the individuals who received deposits into his account on behalf of DEDEAUX.

64. On March 25, 2014, SA Moriarty and IRS McCain interviewed SERB in regards to the DEDEAUX DTO. SERB stated that drug proceeds were deposited into accounts specified by DEDEAUX. The account name and bank information was communicated via an encrypted text message between SERB and DEDEAUX. SERB stated that DEDEAUX provided O'CONNELL's name and bank account information to deposit money into.

65. 916-337-9866, subscribed to Richard O'CONNELL, 848 Fieldstone CT, Folsom, CA 95630, was in contact with 916-698-3806, 208-608-9560, 916-662-1513, and 209-620-3144 approximately 168 times from November 12, 2013 to July 5, 2014. The four telephones are, or were, used by DEDEAUX.

66. Based on O'CONNELL's name and bank account information on COLWELL's phone, the statements by COLWELL and SERB, and phone toll analysis between DEDEAUX and O'CONNELL, I believe that O'CONNELL conspired with DEDEAUX to allow the use of his bank account to conceal drug proceeds.

**Krislen BRIDGES**

67. On March 7, 2014, BPD arrested COLWELL en route from Rancho Cordova, CA to Boise, ID transporting cocaine, hash oil, and miscellaneous pharmaceuticals. COLWELL signed a BPD Voluntary Consent to Search form for the four phones in his possession. COLWELL explained to BPD and DEA that DEDEAUX, SERB, SNYDER, and COLWELL used an encrypted text messaging app called TXTcrypt to communicate the financial transactions for drugs sourced by DEDEAUX. BPD took pictures of the TXTcrypt messages on COLWELL's phone that contained names and bank account information. BRIDGES' name and bank account was provided on at least four occasions as presented on Attachment 1.

68. On March 25, 2014, SA Moriarty and IRS McCain interviewed SNYDER in regards to the DEDEAUX DTO. SNYDER stated that he deposited money into bank accounts controlled by DEDEAUX. SNYDER further stated that DEDEUAX provided him bank account names and numbers to deposit drug related proceeds. SNYDER recalled BRIDGES as the holder of one of the accounts that he deposited money into as directed by DEDEAUX.

69. Based on BRIDGES name and bank account information on COLWELL's phone and the statement by SNYDER, I believe that BRIDGES conspired with DEDEAUX to allow the use of her bank account to conceal drug proceeds.

**Meuy Lai SAECHAO**

70. On March 7, 2014, BPD arrested COLWELL en route from Rancho Cordova, CA to Boise, ID transporting cocaine, hash oil, and miscellaneous pharmaceuticals. COLWELL signed a BPD Voluntary Consent to Search form for the four phones in his possession. COLWELL explained to BPD and DEA that DEDEAUX, SERB, SNYDER, and COLWELL used an encrypted text messaging app called TXTcrypt to communicate the financial transactions for drugs sourced by DEDEAUX. BPD took pictures of the TXTcrypt messages on COLWELL's phone that contained names and bank account information. SAECHAO's name and bank account was provided on at least two occasions as presented on Attachment 1.

71. 916-501-4152, subscribed to Meuy Lai SAECHAO, 5018 Marconi Ave #260, Carmichael, CA 95608, was in contact with 916-698-3806, 208-608-9560, 916-662-1513, and 209-620-3144 approximately 61 times from November 23, 2013 to July 3, 2014. The four telephones are, or were, used by DEDEAUX.

72. Based on SAECHAO's name and bank account information on COLWELL's phone and phone toll analysis between DEDEAUX and SAECHAO, I believe that SAECHAO conspired with DEDEAUX to allow the use of her bank account to conceal drug proceeds.

Affiant's application of knowledge and experience regarding drug trafficking organizations

73. Based upon my training and experience in the investigation of controlled substance offenses and based upon my consultation with other law enforcement agents and officers trained and experienced in large scale drug trafficking investigations, I know the following about drug trafficking, and drug traffickers:

i. Drug traffickers generally use various methods to protect the property where the controlled substance is stored or distributed from both intruders and law enforcement detection;

ii. Drug traffickers often use security systems and other forms of counter-surveillance, such as video cameras and monitors and motion devices;

iii. Drug traffickers will commonly package their product where it is produced and also at their residences;

iv. It is common for drug traffickers to maintain books, receipts, purchase orders, notes, ledgers, notebooks, and other forms of records specifically relating to their drug distribution activities, in order to account for the transportation, ordering, purchase, manufacturing and distribution of their illegal drugs and the remittance of drug proceeds. Moreover, because drug traffickers will often "front" (that is, sell on consignment) controlled substances to their clients and sometimes be "fronted" controlled substances from their suppliers, such documentation is necessary to keep track of the amounts paid and owed with respect to their customers and suppliers. These ledgers are more commonly known as "pay/owe" sheets and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets. Such records, which are frequently encoded in order to protect those involved in the distribution activities, will often be maintained by drug traffickers on their persons or in their residences, stash-houses, businesses, and/or vehicles so that they are close at hand and readily available for the purposes of ascertaining current balances;

v. Drug traffickers frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses and email addresses, sometimes encoded and sometimes not, for the purpose of contacting their suppliers, customers, transporters and others involved in their illicit drug distribution activities, and these records are typically maintained on their persons or in their residences, in structures at cultivation

sites, stash-houses, businesses, and/or vehicles, so they are readily available in order to efficiently conduct their drug trafficking business;

vi. Drug traffickers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship illegal drugs and money to various points within the United States. They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services, speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another. They often use hand-written air bills, drop the packages near closing time, pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement. Drug traffickers frequently maintain records relating to their use of these services, such as receipts, copies of air bills, and package tracking records accessed over the internet, on their person, at their residences, in structures at cultivation sites, stash-houses, businesses, and/or in their vehicles, where they are available for reference;

vii. It is common for drug traffickers to conceal large sums of currency and precious metals, jewelry, wire transfer receipts, cashier checks, money orders, and other financial instruments or items of value which either represent the proceeds from drug sales or are intended for the purchase of controlled substances, including documentation relating to the purchase of real estate and motor vehicles; and when drug traffickers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement. To accomplish this, drug traffickers will use different techniques, sometimes simply by locking large amounts of currency in secured containers immediately available to them, but also by the use of foreign and domestic banks and their attendant services, including savings and checking accounts, securities, cashier's checks, money drafts, letters of credit, brokerage houses, the purchase of real estate or vehicles, and the establishment of shell corporations and business fronts. They typically keep records of such activity, including accounting books, receipts, bank statements and records (of both foreign and domestic banks), money drafts, letters of credit, money order and/or cashier's check receipts, wire transfers, passbooks, bank

checks, and tax returns. Drug traffickers often utilize fictitious or "strawholder" owners and shell corporations to conceal the true ownership and illegal source of real property, vehicles, or other valuable items purchased with the proceeds of illicit drug sales. In addition, drug traffickers often make use of wire transfers, cashier's checks, and money orders to pay for controlled substances or make remittance for other costs relating to the distribution of illicit drugs. Courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, the trafficking of controlled substances. Those involved in the distribution of drugs typically maintain currency and money counters, precious metals, jewelry, wire transfers, cashiers' checks, money orders, and other financial instruments, as well as records or other evidence relating to financial transactions, income, banking, and expenditures of money and wealth in connection with drug trafficking on their persons or in their residences, in structures at cultivation sites, stash-houses, businesses, and/or vehicles, where they are concealed from law enforcement and readily available;

viii. Those involved in the distribution of illicit drugs often travel by car, bus, train, or airplane, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with coconspirators, conduct drug transactions, or to transport drugs or drug proceeds. Documents relating to such travel, such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent-use club membership information, and records and receipts associated with airlines, rental car companies, and/or hotels, credit card bills and receipts, photographs, videos, passports, and visas, are often maintained by drug traffickers on their person, in their residences, in structures at cultivation sites, stash-houses, businesses, and/or vehicles, where they are readily available for use or reference;

ix. Drug traffickers frequently utilize cellular telephones in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities, and these items, along with corresponding purchase, service, and billing records, are often maintained on their persons or in their residences, in structures at

cultivation sites, stash-houses, businesses, and/or vehicles, where they are readily available;

x. Drug traffickers frequently use pre-paid cellular telephones or cellular telephones subscribed in fictitious or "nominee" names. "Nominee" names are names of real persons who are not the trafficker. They may be friends, relatives, or co-conspirators who are aware that the trafficker is using their identity, or they may be innocent persons who are unaware that their identities are being used. Narcotics traffickers frequently employ more than one cellular telephone to conduct their illegal activities. Traffickers use this method to evade law enforcement electronic surveillance as well as to compartmentalize their organizations. Drug traffickers also frequently take, or cause to be taken, photographs and/or videos of themselves, their criminal associates, their assets (including real and personal property), their weapons, and their drugs, and such items are typically maintained on their persons, in their residences or nearby structures, businesses, and/or vehicles;

xi. Based on my training and experience, I believe that those involved in ongoing, long-term conspiracies to distribute illegal drugs such as oxycodone, hash oil, and cocaine often maintain the types of items described above on their person, in their residences, in structures at and near stash-houses, businesses, and in their vehicles on an ongoing, long-term basis so as to facilitate the conspiracy and prevent detection;

74. Accordingly, and in light of the facts and circumstances described above, I believe the aforementioned items, which are more particularly described in Attachment B, and which constitute evidence of, the fruits of, and/or the instrumentalities of a distribution and possession with intent to distribute conspiracy in violation of 21 U.S.C. §§ 846 and 841(a)(1) will be found and seized as a result of the requested searches of the Subject Premises.

## REQUEST TO SEAL COMPLAINT AND SEARCH WARRANTS

75. I believe that, should the contents of the complaint, the search warrants and affidavit be made public, it would jeopardize this continuing investigation and any personnel assigned to or cooperating in this investigation. I also know, based upon my training and experience, that if the

subject of this investigation or his associates were notified that a criminal investigation exists, they would have the opportunity to destroy evidence, notify co-conspirators, or flee from prosecution. For the foregoing reasons, and because this is an ongoing investigation, I request that the complaint, the search warrants and the accompanying affidavit be sealed until further order of the court.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

CONCLUSION

76. Based upon the evidence set forth herein, I believe that there is probable cause to believe that evidence, instrumentalities and fruits of the crimes of conspiracy to distribute and possession with intent to distribute oxycodone, and conspiracy to distribute and possession with intent to distribute cocaine, respectively in violation of 21 U.S.C. §§ 841(a)(1) and 846, will be found at the Subject Premises of the person(s), residence, and all rooms, attics, basements, and other parts therein, and the surrounding grounds and any garages, storage units, trash containers, trailers and outbuildings of any kind, including vehicles located thereon. For these reasons, I respectfully request the issuance of a search warrant for the locations described and depicted in Attachment A, authorizing any agent of the Drug Enforcement Administration, with the assistance of other law enforcement officers, to enter and search the premises for items more particularly described in Attachment B, all of which are evidence, instrumentalities and fruits of violations of 21 U.S.C. §§ 841(a)(1) and 846. I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Craig Tom II
Diversion Investigator
Drug Enforcement Administration

Sworn and subscribed to before me

This 21 day of July 2014

HON. KENDALL NEWMAN
United States Magistrate Judge

Approved as to form:

Olusere Olowoyeye

Assistant United States Attorney

**ATTACHMENT A-1**
**Location to Be Searched**

Location to be searched: 3250 Laurelhurst Drive, Apartment 168, Rancho Cordova, CA

This search warrant grants authority to search: 3250 Laurelhurst Drive, Apartment 168, Rancho Cordova, CA. The residence is located within a large multi-family dwelling complex (Ashgrove Place Apartments). The gated apartment complex is described as brown and cream and is positioned just south of California Highway 50 and west of Laurelhurst Drive. There is only one entrance into the complex (from the south) and Apartment 168 is located within the furthest southeast structure and just north of the swimming pool. Apartment 168 is a lower level unit and is single story. Apartment 168's entrance faces south into a breezeway and has a patio facing west towards the parking lot and driveway. The numbers "168" are posted on the wall to the left of the front door. There is assigned parking for tenants adjacent to the location to be searched.

The search of the aforementioned location shall include:

ANY AND ALL attachments, attics, basements, garages, safes, carports, outbuildings, appurtenances thereto, and all other areas within the curtilage, and any vehicles parked on the premises and/or in the possession and/or control of Ajellon DEDEAUX, as evidenced by his possession of keys and/or registration documents, at the time of the execution of this search warrant.

ANY AND ALL vehicles parked on or in front of the subject premises at the time of the service of the search warrant, provided that such vehicles are shown to be registered to Ajellon DEDEAUX, and/or any business associated with them, or shown to be owned, controlled, or used by Ajellon DEDEAUX.

**ATTACHMENT A-2**
**Location to be Searched**

Location to be Searched: 8965 Rosetta Circle, Sacramento, CA

This search warrant grants authority to search: 8965 Rosetta Circle, Sacramento, CA. The residence is located on the north side of Rosetta Circle with the front door facing south. The property is described as a one-story white structure with a gray pitched roof and blue trim. The numbers "8965" is posted above and to the left of the two-car garage, which also faces south. The location does have a driveway.

The search of the aforementioned locations shall include:

ANY AND ALL attachments, attics, basements, garages, safes, carports, outbuildings, appurtenances thereto, and all other areas within the curtilage, and any vehicles parked on the premises and/or in the possession and/or control of Coral WILSON and Glenn BARROWS, as evidenced by her possession of keys and/or registration documents, at the time of the execution of this search warrant.

ANY AND ALL vehicles parked on or in front of the subject premises at the time of the service of the search warrant, provided that such vehicles are shown to be registered to Coral WILSON and Glenn BARROWS, and/or any business associated with them, or shown to be owned, controlled, or used by Coral WILSON and Glenn BARROWS.

**Attachment B**
**Items to be Seized**

Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"):

- Title 21 U.S.C. Sections 846 and 841(a)(1) – Conspiracy to Distribute and Possess with Intent to Distribute Oxycodone.

- Title 21 U.S.C. Sections 846 and 841(a)(1) – Conspiracy to Distribute and Possess with Intent to Distribute Cocaine.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. Controlled substances, including oxycodone, hashish oil, cocaine and cocaine base, or items frequently used to distribute oxycodone, hashish oil, cocaine and cocaine base, or items containing residue from the distribution of oxycodone, hashish oil, cocaine and cocaine base; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

2. United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used to purchase oxycodone, hashish oil, cocaine and cocaine base during in this investigation;

3. Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

4. Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1);

5. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

6. Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7. Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

9. Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10. Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person;

11. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records; and

12. All names, words, telephone numbers, email addresses, time/date information, messages or other electronic data in the memory of the mobile telephone or on a server and associated with mobile telephones that are associated with Ajellon DEDEAUX and his coconspirators during execution of the warrant. This authority to search such mobile telephones includes the following within each mobile telephone:

A. Incoming call history;
B. Outgoing call history;
C. Missed call history;
D. Outgoing text messages;
E. Incoming text messages;
F. Draft text messages;
G. Telephone book;
H. Data screen or file identifying the telephone number associated with the mobile telephone searched;
I. Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;
J. Voicemail;
K. User-entered messages (such as to-do lists);
L. Photographs; and
M. Any passwords used to access the electronic data described above.